Rafaela Santiago, Plaintiff and Appellee, *v.* Ulises Jiménez, Defendant and Appellant.

No. 3790.   Argued February 19, 1926.—Decided April 28, 1926.

*Juan B. Soto* for the appellant.   *Ramón Díaz Collazo* for the appellee.

Mr. Justice Hutchison delivered the opinion of the court.

Plaintiff obtained a decree of divorce and defendant says that—

"First: The court erred in sustaining the complaint and, consequently, all its averments, when in fact not only were they not shown but they were controverted by the evidence of defendant.

"Second: The court erred in sustaining the complaint and not dismissing it, it not appearing from the evidence that plaintiff was the innocent party with regard to the incidents that gave rise to the action, she having admitted her guilt with regard to them."

The divorce was granted upon the ground of cruel treatment. Plaintiff testified to an aggravated assault by the defendant upon the return of plaintiff after having gone out of the house upon an errand in disobedience to the previous orders of the defendant.

The defendant denied the battery, but admitted on the stand that while plaintiff was attending church, defendant searched her trunk and found a letter from her mother; that thereafter, through the carrying out of a carefully devised plan, defendant succeeded in taking plaintiff by surprise in

the act of replying to the communication above mentioned; and upon refusal to deliver such reply defendant obtained possession thereof by force.

These two letters were introduced in evidence by defendant. The first is quite complimentary to defendant, contains much wholesome advice and appears to have been written by an exceptionally discreet mother-in-law, as well as a wise and affectionate mother. Unfortunately for plaintiff, however, it also plainly appeared to have been written in answer to a complaint on the part of the daughter.

The reply to the letter, confiscated by defendant, contains an account of physical violence and abusive language on the part of defendant; and defendant admits that following the incident above mentioned he sent plaintiff to her mother.

Plaintiff at the time of the foregoing events was a young woman of twenty years and *encinta*.

The exact age of defendant does not appear, but the record discloses that he was the father of six children by a former wife, from whom he had obtained a divorce shortly before his marriage to plaintiff.

The testimony for defendant also tends to corroborate that of plaintiff as to another more or less violent scene which followed immediately upon the arrival of defendant at the dwelling of the daughter and of the mother-in-law shortly after the birth of the child. Here also defendant admits that upon refusal of the wife to permit him to see the child he threatened to take it away and gave the impression that he was about to execute the threat.

The mayor of the town as a witness for defendant testified that he was informed of the disturbance and arrived upon the scene in time to see the wife disappear around the street corner with her baby. He also said that he found defendant in a state of nervous excitement and persuaded him to return to his hotel.

The testimony as a whole, including that for the defend-

ant; leaves no room for doubt that plaintiff received a severe shock.

The trial judge evidently accepted as true the version given by plaintiff as to the harsh words used by defendant and false charges of infidelity and misconduct said to have been made by him on this occasion.

■ Whether or not the acts imputed to defendant by plaintiff, extending over a period of several months, amount to cruel treatment necessarily depends in a large measure upon the degree of education, culture and refinement possessed by the wife. Of these matters the court below was in a better position to judge from the general appearance and the demeanor of the plaintiff as a witness upon the stand than is afforded this tribunal by a perusal of the stenographic record. All things considered, we are not disposed to disturb the conclusion reached below upon this point.

■ The second proposition contained in the assignment of errors is based upon certain admissions of guilt contained in a letter already mentioned and upon similar admissions made by plaintiff on cross-examination.

From the stenographic record we take the following extract:

"Defendant: Q. You have said that you do not know the motives that defendant has in being angry with you? A. No. sir. Q. Is it not true that you told him several times in Aguas Buenas that you hated him, that you did not like him, that you did not want to have any relations with him? A. Yes, sir, as he was always quarreling with me; I could not even look through the window; even the laundress had to give me the clothes by the window, because to him everything was bad; I had to get along very smoothly, he was very jealous, I could not live with him. Q. Was he jealous of you? A. Daily, daily. Q. That caused you not to love him? A. Surely, and as he slandered me so often; at the beginning he slandered me very much, you see. Q. Why did he do that, was it his fault or yours? Counsel for Plaintiff: I object to the question; it is impossible for her to answer that. The Court: She can state what was the cause, if she knows it. Defendant: Look at this letter. A. I wrote that letter.

Defendant: We are going to offer it as evidence at the proper time, and I want it marked Exhibit 1 of the defendant. Q. When you wrote this letter to your mother, did you do it answering a letter that she wrote you? A. No, sir; I do not remember that. She wrote me many times. Q. In order to refresh your mind, look at this letter. A. Yes, sir, this is a letter from my mother. Q. A letter that she wrote to you? A. Yes, sir. Q. Was it answering this letter that you wrote her the other? A. I do not know, because she wrote many letters to me. Q. You do not know if it was in answer to this letter? A. I do not know, she wrote many letters to me. Q. Do you know if it was in answer to that? A. That was at the beginning I went there. I was over a month there. That letter of mine that he has, I wrote it nearly a week before the incident occurred, a Sunday afternoon. One Saturday he went to the yard, and I was sitting in a rocking chair and he sat there also, and upon leaving and going in he told me, without my knowing why, that I was a harlot; I do not know what was the matter with him. I had thought that he was a man of capacity, and then I said to him: 'God grant that his eldest daughter be that which he imputed to me,' then he stood up and slapped me, and as I began to cry out he took a chair in order to strike me with it. That was on Saturday evening, and I told him that I was going to give an account of all of it to my mother, so he was watching me to see if I wrote her, and when he went upstairs I was writing, and he took the letter; that was on a Sunday night; he did not say anything, but fought with me, and so we were living for a week; after a week it was that he slapped me because I telephoned my mother asking her how she was; he had told my mother that he would carry her there, as I had written her asking her if she was coming or not, and she did not answer, and I again asked that by telephone.''

The letter in question is as follows:

''Aguas Buenas, P. R., January 21, 1924.—My dear Yoyo:—After greeting you and asking your benediction, I proceed to answer your letter. Yoyo, Honoria did not want to remain here, but she will tell you why. Yoyo, I know that I am guilty in all of this, but it is impossible to continue this life. Yoyo, you know that I do not like this man; I would rather live in poorer conditions at home than to stay here. Yoyo, I wish you could know how this man is; Honoria left for Caguas on Saturday, and he began fighting me and telling me that I was a harlot, and I told him that I hoped that that

might occur to his daughter; and he got up and hit me twice, and as this was the first time he slapped me, now he will go on doing so, and I can not live with him, because I do not love him. Yoyo, I have done everything possible, but I can't. How disgraceful it is to live with a man whom one does not love! This will cause my death. It is impossible to live in this way! Yoyo, do you know how disagreeable it is not to love a person, to die of sentiment? I hope you will come to take me with you. Honoria will tell you about everything, and will tell you that it is my fault; but I do not say it is anybody's fault. I know it, but there is something that pushes me to leave him, and I can not be tranquil for a moment. Please do all you can for me; if things go on as at present I will kill myself, because I can not be a single moment by his side and feel happy. I hope you will hear me. Your daughter, RAFA.''

Such admissions construed in connection with the explanation given in the context can not be regarded as sufficient to constitute without more a defense upon the theory of recrimination. *Kennerley* v. *Kennerley*, 29 P.R.R. 723.

The judgment appealed from must be affirmed.